**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KATHLEEN GIBSON, on behalf of herself and all others similarly situated, | Case No.  1:16-cv-04853 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THE QUAKER OATS COMPANY, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff, Kathleen Gibson ("Plaintiff"), individually and on behalf of all others similarly situated, through her undersigned counsel, hereby files this Class Action Complaint for Equitable Relief and Damages, against Defendant The Quaker Oats Company ("Quaker"), and alleges as follows:

1.     Defendant aggressively advertises and promotes its oatmeal products as "100% Natural," and claims its oats are grown using "eco-friendly" methods that pose "less risk of pollutants and groundwater pollution." These claims are false, deceptive, and misleading. Quaker Oats are not "100% Natural," but instead contain the chemical glyphosate, a potent herbicide that last year was declared a probable human carcinogen by the cancer research arm of the World Health Organization. Glyphosate makes its way into Quaker Oats not simply because it is used as an agricultural weed killer, but because it is sprayed on the oats as a drying agent shortly before harvest.

2.      There is nothing unlawful about Quaker Oats' growing and processing methods. What is unlawful is Quaker's claim that Quaker Oats is something that it is not in order to capitalize on growing consumer demand for healthful, natural products.

3.      Plaintiff brings this deceptive advertising case on behalf of a class of consumers who purchased Quaker Oats in Illinois, and seeks relief including refunds to purchasers for the falsely advertised products and a court-ordered corrective advertising campaign to inform the public of the true nature of Quaker's carcinogen-contaminated oats.

## INTRODUCTION

4.      This is a proposed consumer protection class action against Quaker for injunctive relief and economic damages based on misrepresentations and omissions committed by Quaker regarding certain varieties of its products, which Quaker falsely and deceptively labels and markets as "Natural," "100% Natural," "100% Natural Whole Grain," and "Heart Healthy" or "part of a heart healthy diet." The products are not "Natural," "100% Natural," or "100% Natural Whole Grain" as labeled and marketed. In fact, the products contain glyphosate, a potent and *unnatural* biocide.

5.      Specifically, the products at issue are: (1) Quaker Oats Old-Fashioned, (2) Quaker Oats Quick 1-Minute, and (3) Quaker Steel Cut Oats (collectively, "Quaker Oats," or the "Products").

6.       Aware of the health risks and environmental damage caused by chemical-laden foods, especially packaged foods, consumers increasingly demand foods that are natural and whole, and that omit chemicals.

7.     Quaker knows that consumers seek out and wish to purchase whole, natural foods that do not contain chemicals, and that consumers will pay more for foods that they believe to be natural than they will pay for foods that they do not believe to be natural.

8.     To capture this growing market, Quaker labels its Quaker Oats products as "100% Natural Whole Grain." Quaker also states, on the front labels of its Quaker Oats Old Fashioned product, "As part of a heart-healthy diet, the soluble fiber in Oatmeal can help reduce cholesterol." The back of its Quaker Oats Old Fashioned label advises consumers, "Get your day off to a Heart Healthy Start with Whole Grain Quaker Oatmeal!" *See* Ex. 1 (product labels).

9.     The only ingredient listed on Quaker's "100% Natural Whole Grain" Quaker Oats products is "100% Natural Whole-Grain Quaker Quality Rolled Oats." *See* Ex. 1 (product labels).

10.     No reasonable consumer, seeing these representations, would expect Quaker Oats to contain anything unnatural, or anything other than whole, rolled oats.

11.     Quaker Oats, despite their labels, do contain something other than whole, rolled oats; namely, Quaker Oats contain glyphosate.

12.     Glyphosate is not "Natural" or "100% Natural." Glyphosate is a synthetic biocide and probable human carcinogen, with additional health dangers rapidly becoming known.

13.     Glyphosate is "legal" in connection to food products, insofar as the law does not preclude the use of glyphosate in treating and harvesting crops. Quaker, however, did not and does not simply claim that its Quaker Oats are "legal"; it claims that Quaker Oats are "Natural" and contain "100% Natural Whole Grain" and nothing else. *See* Exhibit 1.

14.     By deceiving consumers about the nature, quality, and/or ingredients of its Quaker Oats, Quaker is able to sell a greater volume of Quaker Oats, to charge higher prices for Quaker Oats, and to take away market share from competing products, thereby increasing its own sales and profits.

15.     Consumers lack the scientific knowledge necessary to determine whether Quaker Oats in fact contain only "100% Natural Whole Grain," to know or to ascertain the true ingredients and quality of Quaker Oats, or to assess the safety of ingesting glyphosate. Reasonable consumers must and do rely on Quaker to report honestly what Quaker Oats contain, and whether the ingredients in fact are "Natural" or "Heart Healthy."

16.     Quaker further hides the fact that the oats contain a modern biocide by marketing some Quaker Oats as "Old Fashioned," and all Quaker Oats under a picture of a man dressed in Colonial-era attire.

17.     Across all Quaker Oats products, Quaker conceals the presence of glyphosate, fails to warn consumers of the presence of glyphosate, and fails to warn consumers about the harmful effects of ingesting glyphosate.

18.     Should any consumer seek further information, Quaker's own website declares that Quaker Oats are "a healthful and tasty ingredient to many recipes." http://www.quakeroats.com/products/hot-cereals/old-fashioned-oats.aspx (last visited April 26, 2016). Quaker's website further promotes the health benefits of Quaker Oats, stating: "Even better, the goodness doesn't stop with the taste; Quaker Oats is 100% whole grains which may help reduce the risk of heart disease." *Id.* (last visited April 26, 2016).

19.     Quaker intended for consumers to rely on its representations, and reasonable consumers did in fact so rely. As a result of its false and misleading labeling, failure to warn, and omissions of fact, Quaker was able to sell Quaker Oats to hundreds of thousands of consumers throughout the United States and to realize sizeable profits.

20.     Plaintiff is not seeking damages for any personal injuries in this Complaint[1]; rather, this case is based on Defendant's misrepresentations and omissions regarding the Quaker Oats Products purchased by Plaintiff and Class Members during the class period, defined below.

21.     Plaintiff and numerous other Class Members who purchased the Products suffered economic damages in a similar manner because they purchased, purchased more of, or paid more for Quaker Oats than they would have had they known the Products were not "Natural" or "100% Natural" as labeled and marketed. When a product purports to be "100% Natural," consumers not only are willing to pay more for the product, they expect it to be pesticide-free. Had Plaintiff and Class Members known at or before the time of purchase that the Products in fact contained glyphosate, a synthetic biocide and probable human carcinogen, they would not have purchased or used the Products, and they will not continue to use them unless and until remedial action is taken.

22.     Plaintiff, and all others similarly situated consumers, did not bargain for Products that contain unnatural ingredients in exchange for their payment of the purchase price. Plaintiff contends that the Products are not "Natural" or "100% Natural Whole Grain" as labeled and marketed, and as a result, such representations mislead consumers into purchasing the Products.

---

[1] All potential claims for individual tort relief by Plaintiff and Putative Class Members are preserved and outside the scope of the damages sought in this litigation.

23. The Products are sold pursuant to unlawful trade practices because they offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

24. Accordingly, Plaintiff seeks relief equal to the aggregate retail purchase price paid by Plaintiff and Class Members during the Class Period, because the Products are worthless and useless due to Quaker's misrepresentations regarding the true nature, quality, and ingredients of the Products and its failure to warn consumers of the presence of glyphosate and the harmful effects of ingesting glyphosate.

25. Plaintiff Gibson brings this action to stop Quaker's deceptive and misleading practices.

## JURISDICTION AND VENUE

26. This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act ("CAFA"). CAFA explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff Gibson is a citizen of Illinois. On information and belief, defendant Quaker Oats Company is a citizen of Illinois. On information and belief, the amount in controversy exceeds $5,000,000.00.

27. This Court has personal jurisdiction over the parties in this case. Plaintiff Gibson is a citizen of Illinois and a resident of Chicago, Cook County, Illinois. On information and belief, Quaker Oats Company is a Chicago, Illinois-based division of PepsiCo, Inc. Quaker purposefully avails itself of the laws of Illinois to market Quaker Oats to consumers in Illinois, and distributes Quaker Oats to numerous retailers throughout Illinois.

28. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of Quaker Oats, occurred within this District. Quaker resides in this District.

## PARTIES

29. At all times mentioned herein, Quaker Oats Company was a Chicago, Illinois-based division of PepsiCo, Inc., a North Carolina corporation headquartered in Purchase, New York, and one of the world's largest food and beverage companies. Quaker was, at all relevant times, engaged in commercial transactions throughout the State of Illinois, including this judicial District, including internet sales.

30. Quaker manufactures and/or causes the manufacture of oat-based food products, and markets and distributes the products in retail stores in Illinois and throughout the United States. Quaker Foods North America, of which upon information and belief Quaker is a part, makes, markets, sells, and distributes products spanning several categories such as hot and ready-to-eat cereals, rice, pasta, dairy, and other branded products.

31.     At all times mentioned herein, Plaintiff Gibson was and is an individual consumer over the age of 18, a citizen of the state of Illinois, and a resident of Cook County, Illinois. During the class period, Plaintiff Gibson has purchased Quaker Oats (specifically, Quaker Oats Old-Fashioned and Quaker Oats Quick 1-Minute) on several occasions at various Mariano's grocery stores in Chicago, Illinois.

32.     In deciding to make these purchases, Plaintiff Gibson saw, relied upon, and reasonably believed Quaker's representations that Quaker Oats are natural and healthful, and comprise only "100% Natural Whole Grain," are "Heart Healthy," and are "part of a heart healthy diet."

33.     When a product purports to be "100% Natural," consumers not only are willing to pay more for the product, they expect it to be pesticide-free.

34.     Plaintiff Gibson was willing to pay more for Quaker Oats because she expected the Products to be pesticide-free. Had Plaintiff Gibson known at the time that Quaker Oats contain the unnatural biocide glyphosate, she would not have purchased or continued to purchase Quaker Oats.

35.     Had Plaintiff Gibson known at the time that Quaker Oats contain the unnatural biocide glyphosate, she would not have purchased or continued to purchase Quaker Oats.

36.     Had Plaintiff Gibson been warned of the dangers of ingesting glyphosate, and of the presence of glyphosate in the Quaker Oats, she would not have purchased or continued to purchase Quaker Oats.

37.     If Quaker Oats were reformulated such that Quaker's representations were truthful, i.e., such that Quaker Oats contained only "100% Natural Whole Grain" and no glyphosate, Plaintiff Gibson would consider purchasing Quaker Oats in the future.

## FACTUAL ALLEGATIONS

38.     American consumers increasingly and consciously seek out natural and healthful food products. Once a small niche market, healthful, natural foods are now sold by conventional retailers, and their sales continue to soar. The trend toward natural and healthful food products includes, for many consumers, a preference for whole grains over processed or otherwise refined grains.

39.     Consumers value natural foods, including whole grains, for myriad health, environmental, and political reasons, including avoiding chemicals and/or additives, attaining health and wellness, helping the environment, and financially supporting companies that share these values.

**I.      Quaker's Brand Image: Natural, "Green," and Environmentally Conscious.**

40.     Hoping to capture this growing market, Quaker markets Quaker Oats as a natural and healthful choice containing only "100% Natural Whole Grain." Quaker does not disclose the presence in Quaker Oats of anything other than "100% Natural Whole Grain."

41.     Quaker cultivates its image as a healthful, wholesome, impurity-free brand—the kind of company whose label claims can be trusted. Indeed, Quaker advertises its Quaker Oats with the "image of a man dressed in the Quaker garb… because the Quaker faith projected the values of honesty, integrity, purity and strength." http://www.quakeroats.com/about-quaker-oats/content/quaker-faq.aspx (last visited April 26, 2016).

42.     Quaker also presents itself as a leader in environmental responsibility. On its website, Quaker asserts, "As part of Quaker's holistic approach to environmental sustainability, we have taken special interest in our milling and manufacturing processes." http://www.quakeroats.com/oats-do-more/for-your-world/oats-and-the-environment/innovations-in-milling-and-manufacturing (last visited April 26, 2016).

43.     Quaker also presents itself as an expert source of information on oats—touting their health benefits and environmentally friendly properties. Quaker's website headlines the "Quaker Oats Center of Excellence," billed as "advancing the unique benefits of the oat" with a "Scientific Advisory Board comprised of prominent experts in science, agricultural sustainability, product innovation and consumer insights." http://www.quakeroats.com/about-quaker-oats/content/quakeroats-center-of-excellence.aspx (last visited April 26, 2016); http://www.quakeroats.com/about-quaker-oats/content/quakeroats-center-of-excellence/meet-the-experts.aspx (last visited April 26, 2016).

44.     Quaker claims that it possesses unique expertise in oat cultivation by its status as the world's largest miller of oats:

> At Quaker, we know our oats. Having worked with farmers for over 70 years, we have high standards for our growers. But we appreciate the farmers who have helped us become the world's largest miller of oats, and have worked with them over the years to implement new changes and innovations in the way they farm their land.

> While the health benefits of oats are well documented, many people will be surprised to learn about the numerous environmental advantages associated with this humble grain. Oats provide benefits to the environment that are surprising from such an unassuming grain.

http://www.quakeroats.com/oats-do-more/for-your-world/oats-and-the-environment/growing-our-oat (last visited April 26, 2016). Quaker's website goes on to assert that cultivating oats reduces the risk of ground- and surface-water contamination and, because oats require less tilling, reduces soil's susceptibility to erosion. *See id.*

45. Quaker asserts, specifically, that cultivating oats *reduces* the use of herbicides that risk pollution and groundwater contamination: "Since oats require less herbicide spray than many other grains, there is less risk of pollutants and groundwater contamination," *id.*, further creating the impression in reasonable consumers that Quaker Oats are "100% Natural" products in which they will not find herbicides.

46. Quaker also suggests that purchasing Quaker Oats is a "green" choice, and that Quaker Oats are "eco-friendly." Its website links to Facebook "conversations" with topics like, "What are some of your tips for living a 'greener' life?" and runs polls like, "What's preventing you from buying 'eco-friendly' products?" *See* http://www.quakeroats.com/oats-do-more/for-your-world/oats-and-the-environment (last visited April 26, 2016).

47. Indeed, Quaker presents itself as a "green" organization from top to bottom:

Quaker is working to incorporate sustainability practices into every facet of its operation. From the corporate level to employee sponsored grassroots organizations, we are dedicated to reducing our impact on the environment.

[. . .]

Our employees reflect and help drive Quaker's commitment to "green" practices. . . .

At every level of Quaker, we are committed to improving our environmental practices throughout every step of our business. Whether it's how our products are packaged and shipped or the types of cups our employees use in the breakroom, Quaker is thinking about how best to implement positive change within the world.

http://www.quakeroats.com/oats-do-more/for-your-world/oats-and-the-environment/we-are-living-change (last visited April 26, 2016).

48.     Quaker also promotes the health benefits of its products, explaining, "With the growing number of people who are overweight or obese in America, it is now more important than ever that we educate ourselves about the foods that we are eating and their nutritional content." http://www.quakeroats.com/oats-do-more/for-your-health/healthy-eating/what-to-look-for-when-reading-food-labels (last visited April 26, 2016).

49.     Nowhere on its website does Quaker mention the presence of glyphosate in Quaker Oats.

50.     Nowhere on its website does Quaker warn of the health risks of ingesting glyphosate.

51.     Nowhere on its website does Quaker explain the environmental risks presented by glyphosate.

**II.     Quaker Oats: Presented as "100% Natural" and "Heart Healthy."**

52.     Quaker prominently labels its Old Fashioned Quaker Oats product as "100% Natural Whole Grain" that is "part of a heart-healthy diet." These representations appear on the front label of the product. Should any consumer seek additional information from the back of the label, Quaker lists the product's ingredients as not only "100% Natural" but also of a particular quality: "100% Natural Whole Grain Quaker Quality Rolled Oats."

53.     Quaker prominently labels its Quick 1-Minute Quaker Oats product as "100% Natural Whole Grain" that is "Heart Healthy." These representations appear on the front label of the product. Should any consumer seek additional information from the back of the label, Quaker lists the product's ingredients as not only "100% Natural" but also of a particular quality: "100% Natural Whole Grain Quaker Quality Rolled Oats."

54.     Quaker prominently labels its Quaker Steel Cut Oats product as "Hearty 100% Natural Whole Grain Oats" that is "part of a heart healthy diet." These representations appear on the front label of the product. Should any consumer seek additional information from the back of the label, Quaker lists the product's ingredients as not only "100% Natural" but also of a particular quality: "100% Natural Whole Grain Quaker Quality Steel Cut Oats."

55.     Upon information and belief, Quaker has profited enormously from its fraudulently marketed products and its carefully orchestrated label and image.

56.     Representing that a product is "Natural," "100% Natural," "100% Natural Whole Grain," or "Healthy" is a statement of fact.

57.     Failing to disclose that a product contains glyphosate and failing to warn of the dangers of ingesting glyphosate are omissions of relevant fact.

58.     Quaker further enhances the image of a natural, wholesome product by marketing some Quaker Oats as "Old Fashioned," and all Quaker Oats under a picture of a man dressed in Colonial-era attire.

59.     Consumers reasonably believe that a product labeled "Natural" or "100% Natural" does not contain synthetic ingredients.

60.     Consumers reasonably believe that a product labeled "Natural" or "100% Natural" does not contain pesticides.

61. In 2014, the Consumer Reports® National Research Center conducted a nationally representative phone survey to assess consumer opinion regarding food labeling. *See* http://www.greenerchoices.org/pdf/consumerreportsfoodlabelingsurveyjune2014.pdf (last visited April 21, 2016).

62. Sixty-six percent of all respondents in the Consumer Reports survey said that a "natural" label on packaged and processed foods means that "no toxic pesticides were used." Eighty-six percent of respondents said that a "natural" label on packaged and processed foods should mean that "no toxic pesticides were used." See *Id.*

63. Consumers reasonably believe that a product labeled "100% Natural Whole Grain," especially a product whose only ingredient is listed as "100% Natural Whole-Grain Quaker Quality Rolled Oats," does not contain anything other than natural oats.

64. Quaker knows and intends that when consumers see labels promising that a product is "Natural," "100% Natural," or "100% Natural Whole Grain," consumers will understand that to mean that, at the very least, the product does not contain synthetic ingredients or harmful chemicals.

65. Referring to its "Old Fashioned" and "Quick Oats" products, Quaker's website states that "100% Natural" "means these products do not contain any artificial or synthetic ingredients, just oats." *See* https://cu.pepsico.com/quaker (last visited April 27, 2016).

66. Consumers reasonably expect that if a product contains a harmful substance, the presence of that substance will be disclosed, and they will be warned of the dangers associated with the substance.

### III.     Glyphosate: The Unnatural Hidden Substance.

67.     Quaker's representations that Quaker Oats are "Natural," "100% Natural," or "100% Natural Whole Grain" are false. In fact, when tested, quantitative testing revealed that Quaker Oats contain glyphosate.

68.     Quaker Oats thus are not "Natural" or "100% Natural," and do not contain "100% Natural Whole Grain," and labeling them as such is misleading and deceptive.

69.     Because glyphosate is a probable human carcinogen, Quaker Oats thus are not "Healthy" or "Heart-Healthy." Moreover, despite Quaker's "Heart-Healthy" claims, the presence of glyphosate in Quaker Oats reduces the level of beta glucan, a soluble fiber linked to improvements in cholesterol levels and cardiovascular health. Under U.S. Food and Drug Administration regulations, the permissibility of a manufacturer's "heart healthy" claims depends, in part, on the level of soluble fibers such as beta glucan in a product.[2]

70.      Quaker thus has a duty to disclose the presence of glyphosate and to warn of the dangers associated with glyphosate.

71.     On information and belief, glyphosate is, by volume, the world's most widely produced herbicide.

---

[2] *See* http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm064919.htm (last visited April 26, 2016).

72.    In 2015, the International Agency for Research on Cancer ("IARC"), a research arm of the World Health Organization, declared glyphosate a category 2A "probable" human carcinogen. A summary of the study underlying this declaration was published in *The Lancet Oncology*, Vol. 16, No. 5 (May 2015).[3] The IARC study noted such carcinogenic risk factors as DNA damage to human cells resulting from exposure to glyphosate. *See id.* Glyphosate has been previously found to be a suspected human endocrine disruptor, with estrogenic effects even at extremely low concentrations.[4]

73.    Glyphosate, as a biocide, functions by disrupting the shikimate pathway.[5] Although humans themselves do not have a shikimate pathway, the shikimate pathway is present in bacteria, including bacteria that inhabit the human gut and are essential to proper immune functioning. Glyphosate thus is suspected to disrupt human immune function as well.

74.    Studies examining low doses of glyphosate-based herbicides at levels that are generally considered "safe" for humans show that these compounds can nevertheless cause liver and kidney damage.[6]

---

[3] Available at http://www.thelancet.com/journals/lanonc/article/PIIS1470-2045%2815%2970134-8/abstract (last visited April 26, 2016).

[4] *See* Thongprakaisang, S. *et al.*, "Glyphosate induces human breast cancer cells growth via estrogen receptors," 59 *Food & Chem. Toxicol.* 129 (June 2013), *abstract available at* http://www.ncbi.nlm.nih.gov/pubmed/23756170 (last visited April 26, 2016); *see also, e.g.*, Gasnier, C. *et al.*, "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines," 262(3) *Toxicology* 184 (Aug. 21, 2009), *abstract available at* http://www.ncbi.nlm.nih.gov/pubmed/19539684 (last visited April 26, 2016).

[5] *See, e.g.*, Heike, H. & N. Amrhein, "The Site of the Inhibition of the Shikimate Pathway by Glyphosate," *Plant Physiol.* 66:823 (1980), *available at* http://www.plantphysiol.org/content/66/5/823.full.pdf (last visited April 26, 2016); *see also* http://www.glyphosate.eu/glyphosate-mechanism-action (last visited April 26, 2016).

[6] Myers, J. et al, "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement." *See also* Seralini G.E., et al, "Republished study: long-term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize," *Environ. Sci. Europe* 2014;26:14, available at http://enveurope.springeropen.com/articles/10.1186/s12302-014-0014-5 (last visited April 20, 2016); Benedetti A.L., "The effects of sub-chronic exposure of Wistar rats to the herbicide Glyphosate-Biocarb, *Toxicol. Lett.* 2004;153(2):227–232, available at http://www.ncbi.nlm.nih.gov/pubmed/15451553 (last visited April 20, 2016); Larsen K. et al, "Effects of Sublethal Exposure to a Glyphosate-Based Herbicide Formulation on Metabolic Activities of Different Xenobiotic-Metabolizing Enzymes in Rats," *Int. J. Toxicol.* 2014, available at

75.     Glyphosate is derived from the amino acid glycine. To create glyphosate, one of the hydrogen atoms in glycine is artificially replaced with a phosphonomethyl group.

76.     Glyphosate is not "Natural."

77.     Glyphosate is neither "100% Natural" nor present in "100% Natural Whole Grain."

78.     On information and belief, glyphosate is used to increase oat harvest for commercial purposes; is not necessary to successful planting, growing, or harvesting of oats; is not a "natural" method of growing or harvesting oats; is applied to oats as a drying agent shortly before harvest; and is applied for commercial purposes only.

79.     Glyphosate is a dangerous substance, the presence and dangers of which should be disclosed.

**IV.     Quaker's Misleading Labeling and Omissions.**

80.     Quaker's conduct in labeling Quaker Oats "Natural," "100% Natural," and "100% Natural Whole Grain" deceived and/or was likely to deceive the public. Consumers were deceived into believing that the listed ingredients were all the ingredients, and that the product was "Natural" and "100% Natural," and that nothing in Quaker Oats was not "Natural." Instead, Quaker Oats contain glyphosate, an *un*natural biocide and probable human carcinogen, with a myriad of other potential health effects.

---

http://www.ncbi.nlm.nih.gov/pubmed/24985121 (last visited April 20, 2016); Mesnage R. et al, "Transcriptome profile analysis reflects rat liver and kidney damage following chronic ultra-low dose Roundup exposure," *Environ. Health* 2015;14:70, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4549093/ (last visited April 20, 2016).

81.    Consumers cannot discover the true nature of Quaker Oats from reading the label. Consumers could not discover the true nature of Quaker Oats even by visiting Quaker's website, which makes no mention of glyphosate. Discovery of the true nature of the ingredients requires knowledge of chemistry and access to laboratory testing that is not available to the average reasonable consumer.

82.    Quaker deceptively and misleadingly conceals material facts about Quaker Oats, namely, that Quaker Oats are not "Natural" or "100% Natural," because in fact they contain glyphosate; and that Quaker Oats are not what a reasonable consumer would consider "Natural" or "100% Natural," because in fact they contain glyphosate.

83.    Quaker fails to warn consumers of the dangers of consuming glyphosate.

84.    Plaintiff and the members of the Class are not at fault for failing to discover Quaker's wrongs earlier, and had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice.

85.    The production process Quaker uses for Quaker Oats is known only to Quaker and its suppliers. Quaker has not disclosed such information to Plaintiff or the Class Members. Testing reveals the presence of glyphosate in Quaker Oats, but only Quaker knows the methods by which its oats are grown, harvested, and processed, or what would account for the presence of glyphosate in Quaker Oats. Quaker's concealment tolls the applicable statute of limitations.

86.    To this day, Quaker continues to conceal and suppress the true nature, identity, source, and production method of Quaker Oats.

## V.    Quaker Knew, or Should Have Known, That Its Representations Were False.

87.    Quaker holds itself out to the public as a trusted expert in the growing, harvesting, and processing of oats.

18

88.    Quaker knew what representations it made on the labels of Quaker Oats. It also knew how the oats were grown, harvested, and processed, and that they were likely to contain glyphosate, an unnatural and dangerous herbicide.

89.    Quaker thus knew all the facts demonstrating that Quaker Oats were mislabeled and falsely advertised, and that it had a duty to disclose the presence of glyphosate and to warn consumers about the dangers associated with glyphosate.

## VI.    Quaker Intended for Consumers to Rely on Its Misrepresentations.

90.    Quaker made the false, deceptive, and misleading representations and omissions intending for Plaintiff and the Class Members to rely upon these representations and omissions in purchasing Quaker Oats.

91.    In making the false, misleading, and deceptive representations and omissions at issue, Quaker knew and intended that consumers would purchase the Quaker Oats when consumers would otherwise purchase a competing product.

92.    Consumers are not only willing to pay more for a product that purports to be "100% Natural" – they expect that product to be pesticide-free.

93.    In making the false, misleading, and deceptive representations and omissions at issue, Quaker also knew and intended that consumers would pay more for "Natural" or "100% Natural" oats that are free of unnatural agents than they would pay for oats that are not "Natural" or "100% Natural," furthering Quaker's private interest of increasing sales of its products and decreasing the sales of the all-natural and/or glyphosate-free products that are truthfully marketed by its competitors.

94.     Quaker knows that consumers prefer "Natural" and "100% Natural" foods, and foods that do not contain dangerous or potentially dangerous chemicals. Quaker knows that consumers will pay more for "Natural" or "100% Natural" foods or would not purchase the foods at all unless they were "Natural" and/or "100% Natural" and/or free from unnatural and potentially dangerous chemicals.

95.     Similarly, independent surveys confirm that consumers will purchase more "Natural" products than conventional products, and will pay more for "Natural" products.

**VII.    Consumers Did Reasonably Rely on Quaker's Misrepresentations.**

96.     Consumers frequently rely on label representations and information in making purchase decisions, especially in purchasing food.

97.     When Plaintiff Gibson and the Class Members purchased Quaker Oats, they saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the presence of glyphosate or any warning of the dangers associated with glyphosate, as detailed above.

98.     These misrepresentations and omissions were uniform and were communicated to Plaintiff Gibson and every other member of the Class at every point of purchase and consumption.

99.     Plaintiff Gibson and the Class Members were among the intended recipients of Quaker's deceptive representations and omissions.

100.    Plaintiff Gibson and the Class Members reasonably relied to their detriment on Quaker's misleading representations and omissions.

101.   Quaker's false, misleading, and deceptive misrepresentations and omissions deceived and misled, and are likely to continue to deceive and mislead, Plaintiff Gibson, the Class Members, reasonable consumers, and the general public.

102.   Quaker's misleading affirmative statements further obscured what it failed to disclose, and the warnings it failed to give. Thus, reliance upon Quaker's misleading and deceptive representations and omissions may be presumed.

103.   Quaker made the deceptive representations and omissions with the intent to induce Plaintiff Gibson and the Class Members to purchase Quaker Oats. Plaintiff Gibson's and the Class Members' reliance upon such representations and omissions may be presumed.

104.   Quaker's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions. Thus, Plaintiff Gibson's and the Class Members' reliance upon such representations and omissions may be presumed as a matter of law; the representations and omissions were material; and a nexus exists between Quaker's conduct, on the one hand, and Plaintiff Gibson's and the Class Members' decisions to purchase Quaker Oats at a certain price, on the other hand.

## VIII.   Quaker's Conduct and Plaintiff's and the Class Members' Injury.

105.   As an immediate, direct, and proximate result of Quaker's false, misleading, and deceptive representations and omissions, Quaker injured Plaintiff Gibson and the Class Members in that they:

a.   paid a sum of money for a product that was falsely represented;

b.   paid a sum of money for a product containing glyphosate, of which they received no warning;

      c.      paid more for a product that was falsely represented than they would have paid had the product not been falsely represented;

      d.      were deprived the benefit of the bargain because the Quaker Oats they purchased were different from what Quaker warranted;

      e.      were deprived the benefit of the bargain because the Quaker Oats they purchased had less value than what was represented;

      f.      did not receive a product that measured up to their expectations as created by Quaker;

      g.      ingested (or caused their children to ingest) a substance that was other than what was represented;

      h.      ingested (or caused their children to ingest) a substance they did not expect or consent to;

      i.      ingested (or caused their children to ingest) a product that included an unnatural substance;

      j.      without their knowing consent, ingested (or caused their children to ingest) an herbicide that is harmful to their health or their children's health;

      k.      without their knowing consent, ingested (or caused their children to ingest) a substance that is, contains, or is produced with a known or suspected toxin, carcinogen, hazardous substance;

      l.      without their knowing consent, ingested (or caused their children to ingest) a substance that poses health or environmental risks;

m.    without their knowing consent, ingested (or caused their children to ingest) a substance that is otherwise harmful to the environment and/or the farmers and other workers who utilize or process such substance;

n.    ingested (or caused their children to ingest) a substance that was of a lower quality than what Quaker promised;

o.    were denied the benefit of knowing what they ingested (or caused their children to ingest);

p.    were caused unwittingly to support an industry that contributes to environmental, ecological, or health damage;

q.    were denied the benefit of supporting an industry that sells natural products and contributes to environmental sustainability; and/or

r.    were denied the benefit of the beneficial properties of the "Natural" products promised.

106.    Had Quaker not made the false, misleading, and deceptive representations and omissions, and had Quaker not failed to warn of the presence of glyphosate and dangers associated with glyphosate, Plaintiff Gibson and the Class Members would not have been injured as listed above. Accordingly, Plaintiff Gibson and the Class Members have suffered "injury in fact" as a result of Quaker's wrongful conduct.

107.   Plaintiff Gibson and the Class Members all paid money for Quaker Oats, but did not obtain the full value of the advertised products due to Quaker's misrepresentations and omissions. Plaintiff Gibson and the Class Members purchased, purchased more of, or paid more for, Quaker Oats than they would have had they known the truth about Quaker Oats. Accordingly, Plaintiff Gibson and the Class Members have suffered "injury in fact" and lost money or property as a result of Quaker's wrongful conduct.

## IX.   Quaker Benefited From Its Misleading Representations and Omissions.

108.   As the intended, direct, and proximate result of Quaker's false, misleading, and deceptive representations and omissions, Quaker has been unjustly enriched through more sales of Quaker Oats and higher profits at the expense of Plaintiff Gibson and the Class Members. As a direct and proximate result of its deception, Quaker also unfairly obtained other benefits, including the higher value associated with a "natural" brand, redirecting sales to it and away from its competitors, and increased sales of its other products.

109.   Plaintiff, and all other similarly situated consumers, did not bargain for Products that contain unnatural ingredients in exchange for their payment of the purchase price.

110.   Defendant has profited by failing to warn consumers of the presence of glyphosate in the Products or of the health effects of consuming glyphosate.

111.   Upon information and belief, Defendant has failed to remedy the problem with the Products, thus causing future harm to consumers. Plaintiff, Class Members, and future purchasers in the consuming public, are at risk of real, immediate, and continuing harm if the Products continue to be sold as is, and without adequate warning of the presence of glyphosate and of the health effects of ingesting glyphosate.

112. Plaintiff would continue to purchase the Products again in the future if they were reformulated so that they did not contain glyphosate.

113. Defendant has failed to provide adequate relief to the Plaintiff or Class Members as of the date of filing this Complaint.

114. Plaintiff contends that the Products were sold pursuant to unfair and unconscionable trade practices because the sale of the Products offends public policy and is immoral, unethical, oppressive, unscrupulous, and caused substantial economic injuries to Plaintiff and Class Members.

115. Reasonable consumers do not expect Products advertised as "Natural," "100% Natural," and "100% Natural Whole Grain" to contain unnatural ingredients such as glyphosate. Defendant's statements and other representations convey a series of express and implied claims and/or omissions which Defendant knows are material to the reasonable consumer in making a purchasing decision, and which Defendant intended for consumers to rely upon when choosing to purchase the Products.

116. Defendant misrepresented the nature, quality, and/or ingredients of the Products, and/or failed to adequately disclose the health risks of ingesting the glyphosate contained in the Products, which was and is false, misleading, and/or likely to deceive reasonable consumers. Reasonable consumers expect the presence of such ingredients to be disclosed so that they can make informed purchasing decisions.

117. Therefore, the Products are valueless, and not worth the purchase price that Plaintiff and Class Members paid for them, and/or are not what Plaintiff and Class Members reasonably intended to receive.

118.    Accordingly, Plaintiff seeks, individually and on behalf of all other similarly situated purchasers of the Products during the Class Period, injunctive relief, and actual economic damages equaling the aggregate purchase price paid for the Products by Plaintiff and Class Members during the Class Period.

119.    Plaintiff also seeks declaratory relief in the form of an order declaring Defendant's conduct to be unlawful, as well as injunctive and equitable relief putting an end to Defendant's misleading and unfair business practices, including clear and full disclosure of the presence of glyphosate in the Products and of the health effects of ingesting glyphosate and/or a reformulation of the Products so that they no longer contain glyphosate.

## **CLASS ALLEGATIONS**

120.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

121.    This action is maintainable as a class action under Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

122.    The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this class action and seek certification of the claims and certain issues in this action on behalf of a Class of individuals (the "Class") defined as:

> **All persons who have purchased the Products, for personal use, and not for resale, within any applicable limitations period until Notice is provided to the Class (the "Class Period").**

123. Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and Defendant's legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

124.    Plaintiff brings the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

125.    Plaintiff reserves the right to amend the Class and definition if further information and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

126.    All members of the Class were and are similarly affected by the deceptive advertising of the Products, and the relief sought herein is for the benefit of Plaintiff and members of the Class.

**A.      Numerosity**

127.    Based on the annual sales of the Products and the popularity of the Products, it is readily apparent that the number of consumers in the Class is so large as to make joinder impracticable, if not impossible. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

**B.      Common Questions of Law and Fact Predominate**

128.    There is a well-defined commonality in the questions of law and fact involved in this case. Questions of law and fact common to Plaintiff and Class Members that predominate over questions affecting only individual members, include:

a.      Whether Defendant's practices and representations related to the marketing, labeling and sales of the Products were unfair, deceptive, fraudulent, and/or unlawful in any respect, thereby violating Illinois law;

b.    Whether Defendant failed to warn Plaintiff and Class Members of the presence of glyphosate in the Products and/or of the health effects of ingesting glyphosate in violation of Illinois law with its practices and representations related to the marketing, labeling, and sale of the Products;

c.    Whether Defendant breached an express warranty created through the labeling and marketing of its falsely labeled Products;

d.    Whether Defendant's conduct as set forth above economically injured Plaintiff and Class Members; and

e.    Whether Plaintiff and Class Members are entitled to injunctive relief.

**C.    Typicality**

129.   The claims asserted by Plaintiff in this action are typical of the claims of the Class Members, as the claims arise from the same course of conduct by Defendant, and the relief sought within the Class is common to the Class Members. Further, there are no defenses available to Defendant that are unique to Plaintiff.

**D.    Adequacy**

130.   Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, and she has retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiff and Plaintiff's counsel will fairly and adequately protect Class Members' interests. Undersigned counsel has represented consumers in a wide variety of actions where they have sought to protect consumers from fraudulent and deceptive practices.

### E.    Declaratory and Injunctive Relief

131.    Certification also is appropriate under Rule 23(b)(2) because Defendant acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the injunctive relief sought on behalf of the Class. Further, given the large number of consumers of the Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

### F.    Predominance and Superiority of Class Action

132.    The prerequisites to maintaining a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) are met because questions of law and fact common to each class member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

133.    A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of the Class Members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class Members. Each Class Member has been damaged and is entitled to recovery as a result of the violations alleged herein.

134.    Moreover, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class Members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class action treatment will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

135.    Plaintiff is unaware of any difficulties in managing this case that should preclude class action.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF ILLINOIS FOOD, DRUG AND COSMETIC ACT

136.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint, as if fully set forth herein verbatim.

137.    Plaintiff and the Class  are "Persons" as defined by 410 ILCS 620/2.1.

138.    Quaker Oats are "Food" as defined under 410 ILCS 620/2.3 because they are "articles used for food or drink in man[.]"

139.    Quaker Oats are "adulterated" foods as defined under 410 ILCS 620/10 because they "bear[] or contain[] any poisonous or deleterious substance which may render [them] injurious to health[.]"

140.    Quaker Oats are "contaminated with filth" as defined under 410 ILCS 620/2.15 because they are "not securely protected … as far as may be necessary by all reasonable means, from all foreign or injurious contaminations."

141.    Quaker Oats are "misbranded" as defined under 410 ILCS 620/2.11 because the labeling or advertisement of the products:

a.    Is misleading in light of the representations made or suggested by statement, word, design, device, sound, or any combination thereof;

b.    Fail to reveal material facts in the light of the representations made or suggested by statement, word design, device, sound, or any combination thereof;

c.      Fail to reveal material facts with respect to the consequences which may result from the use of the products to which the labeling or advertisement related under the conditions of use prescribed in the labeling or advertisement thereof or under such conditions or use as are customary and usual.

142.      Quaker's sale of Quaker Oats violates one or more enumerated acts prohibited under 410 ILCS 620/3, including, but not limited to:

a.      The manufacture, sale, delivery, holding, or offering for sale any food that is adulterated or misbranded;

b.      The adulteration or misbranding of any food;

c.      The receipt in commerce of any food that is adulterated or misbranded and the delivery or proffered delivery thereof for pay or otherwise; and

d.      The dissemination of any false advertisement.

139.      As a direct and proximate result of Quaker's wrongful conduct and violations of 410 ILCS 620, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**

143.      Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint, as if fully set forth herein verbatim.

144.      Quaker is a "person[s]" as that term is defined in 815 ILCS 505/1(c).

145.      Plaintiff and the Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

146.      The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or

employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

142.    Quaker has violated the Illinois CFA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers. Specifically, Quaker has misrepresented the true nature, quality, and ingredients of the Products and failed to adequately warn of and disclose the presence of glyphosate in the Products and/or the health effects of ingesting glyphosate, thereby disseminating representations or omissions that are false, deceptive, and likely to mislead a reasonable consumer, such as Plaintiff and Class Members.

143.    Quaker misrepresented and/or omitted facts about the presence of glyphosate in the Products and the health effects of ingesting glyphosate, which were and are material to Plaintiff's and Class Members' decisions to purchase the Products.

144.    Quaker's sale of the Products is an unfair method of competition, unconscionable act and practice, and an unfair and deceptive act and practice in the conduct of its business.

145.    As a result of Quaker's deceptive and unfair acts, Plaintiff and Class Members have been damaged in the amount of the aggregate retail sales of the Products throughout the Class Period.

146.    Quaker's conduct offends established public policy, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

147.    Quaker should also be ordered to cease and/or continue ceasing its deceptive and unfair advertising, and should be made to engage in a corrective advertising campaign, to inform consumers of the presence of glyphosate in the Products and the health effects of ingesting glyphosate.

**THIRD CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**

148.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint, as if fully set forth herein verbatim.

149.    Throughout the Class Period, Quaker made incorrect representations and/or omissions of fact regarding the Products.

150.    Quaker advertised, labeled, packaged, marketed, distributed, and sold the Products, without adequately warning Plaintiff and  Class Members of the presence of glyphosate in the Products and/or the health effects of ingesting glyphosate on media such as on the Products' packaging and labeling. Further, Quaker represents that the Products are "Natural," "100% Natural," and "100% Natural Whole Grain" despite the presence of glyphosate, a synthetic biocide.

151.    Quaker was negligent in making the misrepresentations and/or omissions at issue because they knew, or should have known, that the Products contain glyphosate.

152.    Plaintiff and  Class Members relied on Quaker's misrepresentations and/or omissions in purchasing the Products they believed did not synthetic or unnatural ingredients, or anything other than "100% Natural Whole Grain."

153.    The factual misrepresentations and/or omissions committed by Quaker were material to Plaintiff and  Class Members in making their purchases of the Products.

154.     Plaintiff and other  Class Members relied upon the incorrect representations and/or omissions made about the Products to their detriment, in that Plaintiff and other  Class Members paid the purchase price for the Products based upon the incorrect representations and/or omissions, and had Plaintiff and  Class Members known the truth about the Products, they would not have purchased the Products.

## FOURTH CLAIM FOR RELIEF
## BREACH OF EXPRESS WARRANTY

155.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint, as if fully set forth herein verbatim.

156.     Quaker provided Plaintiff Gibson and other members of the Class  with written express warranties including, but not limited to, warranties that Quaker Oats were "Natural," "100% Natural," and "100% Natural Whole Grain."

157.     These affirmations of fact or promises by Quaker relate to the goods and became part of the basis of the bargain.

158.     Plaintiff Gibson and members of the Class  purchased Quaker Oats believing them to conform to the express warranties.

159.     Quaker breached these warranties. This breach resulted in damages to Plaintiff Gibson and other members of the Class, who bought Quaker Oats but did not receive the goods as warranted.

160.    As a proximate result of the breach of warranties by Quaker, Plaintiff Gibson and the other members of the Class did not receive goods as warranted. Plaintiff Gibson and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial. Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiff Gibson and the Class Members known the true facts, they would not have purchased Quaker Oats, or would have purchased Quaker Oats on different terms.

**FIFTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

161.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint, as if fully set forth herein verbatim. This cause of action is brought in the alternative to contract or warranty-based causes of action.

162.    As a result of Quaker's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of Quaker Oats, Quaker was enriched at the expense of Plaintiff Gibson and the other members of the Class through the payment of the purchase price, or for the payment of a price higher than otherwise would have been paid, for Quaker Oats.

163.    As a result of Quaker's failure to warn about the presence of glyphosate and about the dangers associated with glyphosate, Quaker was enriched at the expense of Plaintiff Gibson and the other members of the Class through the payment of the purchase price, or for the payment of a price higher than otherwise would have been paid, for Quaker Oats.

164.     Under the circumstances, it would be against equity and good conscience to permit Quaker to retain the ill-gotten benefits that it received from Plaintiff Gibson and the other members of the Class, in light of the fact that the Quaker Oats purchased by Plaintiff Gibson and the other members of the Class were not what Quaker purported them to be. Thus, it would be unjust or inequitable for Quaker to retain the benefit without restitution to Plaintiff Gibson and the other members of the Class  for the monies paid to Quaker for Quaker Oats.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for relief as follows:

A.     Certification of the Class  proposed herein under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3); appointment of Plaintiff Gibson as representative of the Class and appointment of her undersigned counsel as counsel for the Class;

B.     A declaration that Defendant is financially responsible for notifying members of the Class  of the pendency of this suit;

C.     An order declaring Defendant's conduct to be in violation of applicable law and enjoining Defendant from pursuing the unlawful acts and practices alleged herein by adequately disclosing the presence of glyphosate in the Products and of the health effects of ingesting glyphosate;

D.     An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendant as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

E.     For an order requiring Defendant to pay full restitution to Plaintiff and all  Class Members;

F.     For an order requiring Defendant to engage in a corrective advertising campaign to inform the public concerning the true nature of Quaker Oats, including a recall of the products;

G.     For an order requiring Defendant to disgorge all ill-gotten gains flowing from the conduct alleged in this Complaint;

H.     For an award of all damages and penalties authorized by law;

I.     For an order awarding reasonable attorneys' fees and the costs;

J.     For an award of pre- and post-judgment interest on any amounts awarded; and

K.     For such other and further relief as may be deemed just, necessary or proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated:  May 2, 2016                    Respectfully submitted,

/s/ Edward A. Wallace
Edward A. Wallace
Email: eaw@wexlerwallace.com
Amy E. Keller
Email: aek@wexlerwallace.com
**WEXLER WALLACE LLP**
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Kim E. Richman
**THE RICHMAN LAW GROUP**
Email:  krichman@richmanlawgroup.com
81 Prospect Street
Brooklyn, New York 11201
Telephone: (212) 687-8291
Facsimile: (212) 687-8292

Beth E. Terrell
Email: bterrell@terrellmarshall.com
Erika L. Nusser
Email: enusser@terrellmarshall.com
**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

John W. Barrett
Email: jbarrett@baileyglasser.com
**BAILEY & GLASSER LLP**
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110

*Attorneys for Plaintiff Gibson and the Proposed Class*